UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NOAH JACKSON,<br><br>Defendant. | Case No. 23-CR-53 (ABJ) |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. The defendant, Noah Jackson, is before this Court after pleading guilty to one count of Unlawful Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). For the reasons that follow, the United States respectfully requests that the Court sentence the defendant to a term of **37 months' imprisonment**, to be followed by three years of supervised release. In support of its recommendation, the United States respectfully submits this Memorandum in Aid of Sentencing.

**I.      FACTUAL BACKGROUND**

The factual proffer to which the defendant agreed as part of his November 17, 2023 guilty plea establishes the following uncontested facts:

*August 17, 2022*

On August 17, 2022, at 3:05 PM, Metropolitan Police Department ("MPD") officers saw the defendant, Noah Jackson, exit "Market and Vape" and enter the passenger side of a red Infiniti QX30 SUV near 14th and Oak Street, Northwest, Washington, D.C. The vehicle—which had two occupants—drove off at a high rate of speed and failed to come to a complete stop at the stop sign at Holmead Place, Northwest, Washington, D.C. and Oak Street, Northwest, Washington, D.C.

1

Several blocks later, officers again saw the vehicle fail to come to a complete stop at Spring Road, Northwest, Washington, D.C. and Holmead Place, Northwest, Washington, D.C.

After officers initiated a traffic stop in the 900 block of Spring Road, Northwest, Washington, D.C. and the vehicle pulled to the curb, Officers Clifford and Taher observed both occupants erratically moving around inside the vehicle. Specifically, Officer Taher observed the driver shifting his body back and to the right towards the floorboard of the rear passenger side of the vehicle. Officer Clifford also observed the defendant (the front passenger) turning back and to the left towards the same floorboard area on the rear passenger side of the vehicle.

Although officers were in an unmarked cruiser, they activated their lights and approached the vehicle wearing MPD uniforms in broad daylight. When the officers approached the vehicle, the defendant opened the passenger door and moved to exit without being instructed to do so. Officer Clifford ordered the defendant to "get back in the car," positioned himself near the passenger door to prevent the defendant from fleeing and stepped him out of the vehicle. Officer Taher approached the driver's side and saw apparent marijuana and marijuana packaging in the back of the car, which he later collected on the front passenger seat. Officers conducted a pat down of the occupants and conducted a protective search of the passenger compartment, where they observed the driver and the defendant reach.

Officer Jegede discovered a Glock 23 .40 caliber semi-automatic handgun on the floorboard partially underneath the front passenger seat, where the defendant had been sitting. The weapon had a large capacity magazine, one round in the chamber, and 19 rounds in a 22-round capacity magazine. In addition, the weapon had a visible Glock "giggle switch," which ATF subsequently confirmed rendered the gun fully automatic. The defendant knew that the switch on

the firearm converted it to a machinegun and had previously rapped about having such a switch on his Glock, as evidenced in multiple of his music videos posted to YouTube.

DNA testing subsequently linked the defendant to the firearm and the magazine inside of the firearm.

In February of 2018, in Superior Court for the District of Columbia case number 2017 CF3 021278, Defendant Jackson was convicted of Assault with Significant Bodily Injury, Attempted Robbery, and Carrying a Pistol Without a License, all of which are crimes punishable by more than one year of incarceration. The plea paperwork in that case, which the defendant signed, included the maximum penalties for each charge. Therefore, the defendant was aware at the time of his arrest in this case that he had a prior conviction for a crime punishable by more than one year of incarceration.

There are no firearms or ammunition manufacturers in Washington, D.C. Therefore, the firearm traveled in interstate commerce (although there is no allegation or evidence that Defendant Jackson himself brought the firearm across state lines).

*January 25, 2023*

On January 25th, 2023, MPD officers executed a warrant at 1416 Quincy Street, Northwest, Washington, D.C. 20011. Upon entry, officers located Defendant Jackson and seven other individuals, and recovered the following:

1. One (1) stolen 9-millimeter Springfield Armory Hellcat (SN: BA359321) handgun loaded with one round in the chamber and 9 rounds in the 11-round capacity magazine;

2. One (1) stolen 38 Special Taurus 856 UL (SN: ABC429349) revolver loaded with 5 rounds in the cylinder;

3. One (1) 9-millimeter Polymer 80 Ghost Gun (No Serial Number) loaded with 1 round in the chamber and 7 rounds in the 15-round capacity magazine;

4. One (1) stolen 40 Caliber S&W Glock 23 Gen 4 40 (SN: BEDA982) handgun loaded with 9 rounds in the 15-round capacity magazine;

5. One (1) 357 Caliber Glock 31 Gen 4 (SN: WZZ623) handgun loaded with 1 round in the chamber and 11 rounds in the 15-round capacity magazine;

6. One (1) twist containing a white powder-like substance that field-tested positive for cocaine base;

7. One (1) twist containing a white rock-like substance that field-tested positive or cocaine base;

8. Three (3) bags containing a green leafy substance that field-tested positive for THC; and

9. Three (3) digital scales.

A total quantity of approximately 15.9 ounces of marijuana and approximately 15 grams of crack were seized from the location and persons. DNA evidence tied the magazine inside of the Springfield Armory Hellcat to the defendant. (ECF No. 47).

## II.   PROCEDURAL HISTORY

On February 21, 2023, a federal grand jury returned a two-count indictment, charging the defendant with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) (Count One); and Unlawful Possession of a Machine Gun, in violation of 18 U.S.C. § 922(o) (Count Two). (ECF No. 1). On March 7, 2023, the defendant was ordered to be held without bond by Magistrate Judge G. Michael Harvey. (ECF No. 10). On November 17, 2023, the

defendant pled guilty pursuant to a negotiated agreement. (ECF No. 46). Under the agreement, the defendant pled guilty to Count One in exchange for the government agreeing to cap its allocution at **37 months' imprisonment**. (ECF No. 46 at 5).

### III. LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in

    the guidelines –
     (i) issued by the Sentencing Commission ...;
     and
     (ii) that, . . . are in effect on the date
     the defendant is sentenced; ...

  (5) any pertinent policy statement –
    (A) issued by the Sentencing Commission ... and
    (B) that, . . . is in effect on the date the defendant is
    sentenced.

  (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

  (7) the need to provide restitution to any victims of the offense.

## IV.  UNITED STATES' ANALYSIS OF THE SENTENCING GUIDELINES

### A. The Defendant's Total Offense Level is 17

The defendant's total offense level is 17 under the calculations listed below:

*Count One: 18 U.S.C. § 922(g)(1)*

| | | |
|---|---|---|
| U.S.S.G § 2K2.1(a)(4)(B) | Base Offense Level | 20 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | - 3 |
| | **Offense Level** | **17** |

The base offense level for Count One is 20 under U.S.S.G. §2K2.1(a)(4)(A) because, as discussed below, the defendant committed this offense after being convicted of Assault with Significant Bodily Injury, Attempted Robbery and Carrying a Pistol Without a License in 2017 CF3 021278. Three points are deducted for acceptance of responsibility under U.S.S.G. §§3E1.1(a), (b), for a **total offense level of 17**. See PSR 8-9

### B. The Defendant's Criminal History Category is IV, and His Guidelines Range Is 37 to 46 Months' Imprisonment

The government also concurs with Probation's assessment of the defendant's criminal history, as set forth in the PSR. U.S.S.G. § 4A1.1 governs the calculation of a defendant's criminal

history for Guidelines' purposes. Section 4A1.1 assigns "points" for each of defendant's prior sentences of imprisonment; the number of criminal history "points" assigned to each sentence depends on the severity of the sentence and when it was imposed. U.S.S.G. §§ 4A1.1(a)-(d). As reflected in the PSR, the defendant's total criminal history score is eight (8), establishing a criminal history category of IV, despite the government's original estimation at category III. *See* PSR 9-17.

With a criminal history category of IV and a total offense level of 17, the defendant's guidelines range is 37 to 46 months' imprisonment. As previously acknowledged, the government will cap its allocution at 37 months' imprisonment, consistent with the estimated range in the plea agreement.

V. **THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The crimes at issue here merit a sentence of at least 37 months' incarceration. In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

As stated above, the government requests that the court sentence the defendant to **37 months' imprisonment**, to be followed by three years of supervised release.

A. **Nature and Circumstances of the Offense**

The nature and circumstances of this offense are serious and warrant a sentence of **37 months' imprisonment**. As a threshold matter, the defendant's possession of a loaded semi-automatic pistol was an inherently dangerous act that placed the community at risk. *See, e.g.*,

*United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence").

While this case does not involve the defendant's use of the recovered firearm, people carry guns because they intend to use them. And while the defendant's crime did not result in any direct violence against another, unlawful possession can lead to dangerous consequences, thereby underscoring the need to take such crimes seriously. This is especially true where, as here, the defendant was arrested on August 17, 2022 for illegally possessing a Glock 23 .40 caliber semi-automatic pistol, capable of fully automatic fire, loaded with one round in the chamber and an additional 19 rounds of ammunition in a 22-round magazine that was located on the floorboard partially underneath the front passenger seat where the defendant had been sitting.



*Figure 1: Semi-automatic pistol with a "giggle switch" and an extended magazine*



*Figure 2: 22-round magazine that contained 19 rounds of ammunition*



*Figure 3: "Giggle switch" that rendered the gun fully automatic*

This crime presents a particular danger to the community because the defendant kept the semi-automatic firearm within arm's reach, ready to spray 19 rounds of ammunition on a target of his choosing. Since 2017, the nation has experienced an exponential boom in machine gun conversion switches nationwide. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), 4-5 (2023) "National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two," *available at* https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-vii-recommendations/download (noting 570% increase in number of recovered machine gun conversion parts in 2017 to 2021 compared to 2012 to 2016).

Washington, D.C. has not escaped this alarming trend. Indeed, the dramatic increase in Machine Gun Conversion Switches recovered in the past two years alone is frightening. Below are the estimated number of recovered Machine Gun Conversion Switches recovered in Washington D.C., according to ATF Washington Field Division (WFD) crime gun analytics:

10

- 2021 – 27 Machinegun Conversion Switches Recovered
- 2022 – 119 Machinegun Conversion Switches Recovered

There was an *over 340%* increase in recoveries of Machine Gun Conversion Switches in the District from 2021 to 2022. The firearm that the defendant possessed, along with its ability to spray bullets automatically had the potential to cause grievous bodily injury (or death) to members of the community, law enforcement, or to the defendant himself.

Machine gun conversion devices dramatically increase how quickly the firearm shoots. In seconds, the shooter is able to empty the magazine of all of its rounds. When combined with a 22-round magazine – as the defendant had in this case – a machine gun conversion device on a weapon means that in just seconds, the shooter can fire 22 rounds with one pull of a trigger.

The defendant's crimes are not isolated from the community he lives in, rather they directly affect the community and the people who live in it. The homicide rate has skyrocketed, with the past two years having the highest homicide rates since 2003:  In 2021, there were 226 homicides, and in 2022, there were 203 homicides. *District Crime Data at a Glance: 2023 Year-to-Date Crime Comparison*, Metro. Police Dep't, https://mpdc.dc.gov/page/district-crime-data-glance (last visited April 22, 2024). While the defendant's crime did not result in any direct violence against another, the use of a firearm can lead to dangerous consequences, thereby underscoring the need to take such crimes seriously. Everyone who possesses firearms with "Glock switches" and 22-round magazines amps-up the pressure and likelihood that a gun battle involving machineguns with high-capacity magazines will cause immense loss and suffering to the community. In view of the nature and circumstances of this offense, a sentence of **37 months' imprisonment** is warranted.

### B. The History and Characteristics of the Defendant

Although the defendant has accepted responsibility for his actions in this case, his unlawful possession of a semi-automatic pistol with a giggle switch is particularly troubling considering his criminal history. As detailed above, the defendant's criminal history category is IV.

Defendant Jackson has a long criminal history and is no stranger to the criminal justice system, as outlined on pages 9 through 11 of the PSR. Moreover, this is not the defendant's first conviction for illegally carrying a weapon. As mentioned in the PSR, the defendant pled guilty to Attempted Robbery, Carrying a Pistol without a License, and Assault with Significant Bodily Injury in 2017 CF3 021278. PSR at 12. According to the defendant's proffer, he along with two other people robbed one victim of $60, a wallet and iPhone and then proceeded to rob and beat a second victim to the point of unconsciousness. Gov't Ex. A – 2017 Proffer at 1. The unconscious victim suffered a skull fracture and required stitches. *Id.* According to the proffer, two of the three suspects had firearms and one of them pointed a firearm at the victim before robbing and beating both. *Id.* After the robbery, police disseminated a BOLO for the defendant, his two co-defendants and the car they were riding in. The police located the car (which was later determined to be stolen), and the driver led the police on a high-speed chase and crashed the car. The defendant, who was a passenger in the vehicle, was detained at the scene. When officers arrested the defendant, they recovered a loaded pistol.

In addition to the defendant's previous firearm conviction, the defendant has a history of dangerous criminal conduct and violating the terms of his release. While on supervision in 2017 CF3 021278 Court Services and Offender Supervision Agency (CSOSA) submitted 11 violation reports over the course of 3.5 years. PSR at 15. Below are the most notable.

- October 1, 2018: arrested on an aggravated assault offense;

- January 9, 2020: arrested for theft, destruction of property and false report to officer offenses;

- January 20, 2021: arrested Maryland on firearm and ammunition offenses;

- August 17, 2022: arrested on firearm offenses; and

- January 25, 2023: arrested on firearm and drug offenses.

PSR at 15-16. According to the PSR, the defendant was arrested on three separate firearm cases *after* he pled guilty to attempted robbery and a firearm offense. The defendant's history of compliance was so poor, the Court ultimately revoked his probation. PSR at 15.

The nature of the defendant's prior arrests and convictions reflect a blatant and repeated disregard for the rule of law. His criminal history demonstrates that the defendant is dangerous and that a lengthy prison sentence is necessary.

### C. The Need for the Sentenced Imposed

While thankfully no one was hurt in the instant case, the firepower the defendant possessed heightened the danger to the defendant, the police, and the community. A significant term of incarceration is necessary to incapacitate the defendant and protect the community from him.

Moreover, as noted above, this is not the defendant's first time illegally carrying a firearm. The fact that the defendant has pled guilty to illegally carrying a firearm after pleading guilty once before is evidence that the defendant did not learn his lesson and that a substantial prison term is also necessary to deter the defendant from unlawfully possessing firearms in the future.

The government's requested sentence is reasonable, as it strikes the balance between considering the defendant's background and his decision to accept responsibility in this matter. According to the U.S. Sentencing Commission's Interactive Data Analyzer, defendants who were sentenced on firearm offenses pursuant to §2K2.1 in Fiscal Year 2023, with a criminal history

13

category of IV, excluding career offenders, received sentences in line with the government's request here. Specifically, of 1,556 cases reported to the Commission, the median sentence length was 46 months. This demonstrates that the governments requested sentence of is generally consistent with the average defendant sentenced in District Courts for similar crimes and with similar criminal history. *See U.S. Sentencing Commission Interactive Data Analyzer*, *available at* https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited April 2, 2024). These statistics demonstrate that the government's request is well within the framework of fair and just sentences as determined by courts across the nation.

## CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court sentence Defendant Noah Jackson to **37 months' imprisonment** to be followed by three years of supervised release.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        D.C. Bar No. 481052

By:   /s/ *Jared English*
        JARED ENGLISH
        Assistant United States Attorney
        D.C. Bar No. 1023926
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20530
        Telephone: 202-465-0089
        Email: Jared.English@usdoj.gov